CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 1 3 2006

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JERRY J. NOLAN, et al., | ) | Civil Action No. 7:04CV00731 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| J.D. TERRY, et al., | ) | By: Samuel G. Wilson |
| Defendants. | ) | United States District Judge |

Plaintiffs Jerry J. Nolan, Charles D. Wright, and E.D. Wise, former correctional officers at Botetourt Correctional Center (Botetourt), bring this 42 U.S.C. § 1983 action against defendants, J.D. Terry, the warden at Botetourt, and Tim Yates, his second in command. Plaintiffs claim that defendants violated their First Amendment rights by transferring them to other institutions because they complained and filed grievances about various matters including that their superiors undermined their authority and emboldened inmates at Botetourt by dismissing institutional charges plaintiffs brought against those inmates. The matter is before the court on defendants' motion for summary judgment on the ground that collateral estoppel bars plaintiffs' claims and on the ground that defendants did not transfer plaintiffs in violation of their free speech rights. Although the court finds that collateral estoppel does not bar plaintiffs' claims, from the uncontradicted evidence, the court finds that the plaintiffs were not speaking as citizens who were expressing their personal views on disputed matters of public concern. Contextually, their dispute did not implicate the public's interest in receiving the well-informed views of government employees engaged in civic discussion. Rather, it implicated employee grievances– grievances designed to supplant defendants' view of proper prison management with their own, and is not protected from the remedial action defendants took in response to it.

Accordingly, the court grants defendants' motion for summary judgment.

I.

Nolan, a guard at Botetourt, filed a grievance in 2002, alleging that a particular institutional hearing officer had failed to process various disciplinary charges he had filed against inmates, an action which, he claimed diminished his authority, emboldened the inmates, and endangered him and fellow employees. A hearing officer who heard the grievance agreed with Nolan and directed the institution to comply with Virginia Department of Corrections operating procedures governing the processing of institutional charges.

In March 2004, Nolan filed a grievance alleging that the hearing officer about whom he had complained made a harassing phone call to his home and his superiors essentially did nothing about it. Nolan initiated three levels of dispute resolution, complaining variously that his supervisors lied, showed favoritism towards the hearing officer, and treated his complaints as frivolous.[1] Although Nolan's superiors arranged a number of meetings to conciliate, Nolan's dissatisfaction was palpable. He demanded, for example, that the department require one of his superiors to attend sensitivity management and a seminar on human relations to "help him understand the pitfalls of favoritism, retaliation, and harassment on the job."

In May 2004, Nolan filed another grievance. The grievance criticized Yates for using foul language at a staff meeting. Nolan complained that the language shocked, embarrassed, and offended him. He pushed the grievance through three levels of dispute resolution, met with

---

[1] The scope of Nolan's grievance expanded during the dispute resolution stages. For example, Nolan complained that a supervisor made him request permission to use an office computer when his co-workers did not, to support his claim that the supervisor was retaliating against him.

2

administrators on several occasions, rejected Yates apology as "no apology at all," and interspersed his complaint with attacks on his superiors' competency.

Nolan and Wright then joined with two other correctional officers on June 9, 2004, in sending the agency's regional director, Larry Huffman, a letter complaining that Terry continued to permit the hearing officer Nolan had complained about earlier to disregard inmate disciplinary charges, which they believed created a hostile and potentially violent work environment and placed them in "harms way." They complained that the hearing officer "had become incompetent, complacent and too preoccupied with other agenda, neglecting his [prison] duties." They sent a copy of their grievances to the Virginia Attorney General and the Virginia Secretary of Public Safety. Wright also separately authored a memorandum on June 15, 2004, in which he stated that he feared for his personal safety. Wise concurred by voicing his dissatisfaction about the facility's management, complaining directly to Terry about prison procedures and reporting that he felt the administration had retaliated against Nolan.

On June 17, 2004, the Regional Director for the Western Region of the Virginia Department of Corrections, Larry Huffman, temporarily transferred Nolan and Wright to different facilities during the pendency of an investigation into workplace safety at Botetourt by the Office of the Inspector General. Wise was transferred later in June 2004. The special agent who conducted the investigation interviewed all available security personnel at Botetourt and concluded with a written report finding that a majority of employees felt safe and that no credible evidence supported the contention that Botetourt constituted an unsafe working environment.[2]

---

[2] On the issue of inmate disciplinary charges, the special agent found that only a small percentage of charges had been dismissed. He noted that the strict adherence to the disciplinary procedure for which the complaining correctional officers had campaigned, was "equivalent to a

3

On a concluding note, the special agent stated, after examining the long history of complaints and rebuttals, that the "working relationship between all parties has been severely strained and . . . [has] eroded to a level that it is highly improbable that a normal employee-employer working relationship can be enjoyed."

In July 2004, Nolan and Wright filed grievances alleging that defendants retaliated against them by causing their transfers and alleging that Botetourt continued to endanger enforcement officers by ignoring prisoner disciplinary charges. Nolan's and Wright's transfers became permanent in November 2004.[3] Wise's transfer never became permanent; he chose to retire after working at his new facility for roughly six months at the same rank and pay and with a shorter commute. An administrative hearing officer found in the plaintiffs' favor and ordered them returned to Botetourt. However, the Botetourt County Circuit Court reversed the hearing officer's decision, and the plaintiffs appealed to the Court of Appeals of Virginia. Their appeal is still pending.

## II.

Defendants contend that the adverse judgment and findings of the Circuit Court of Botetourt County collaterally estop plaintiffs' claims. "A Federal Court, as a matter of full faith

---

police officer reporting that he intends to issue traffic citations to anyone who exceeds the posted speed limit by one (1) mile per hour."

[3] Terry explained in a letter to Nolan that the decision to make his transfer permanent was based on the belief that Nolan's "daily activities were distracting other staff from performing their responsibilities, thereby, affecting the operation of the facility, and on [Nolan's] belief that Botetourt is an unsafe environment in which to work." According to an affidavit filed by the regional director, Larry Huffman, the transfer was necessary because he "cannot operate an effective prison with officers who are preoccupied with unresolved fears about their physical safety," as it "creates disruption among [his] staff who need instead, to be focused on prison security."

4

and credit, under 28 U.S.C. § 1738, must give a state court judgment the same preclusive effect 'as the courts of such State' would give." In re Heckert, 272 F.3d 253, 257 (4th Cir. 2001). Under Virginia law, collateral estoppel "precludes parties to a prior action and their privies from litigating in a subsequent action any factual issue that actually was litigated and was essential to a valid, final judgment in the prior action." Angstadt v. Atlantic Mut. Ins. Co., 249 Va. 444, 446 (1995). However, a judgment is not final in Virginia for the purposes of collateral estoppel when it is on appeal. Faison v. Hudson, 243 Va. 413, 419 (1992). Because the appeal of the circuit court's decision is still pending in the Court of Appeals of Virginia, its decision has no preclusive effect. Accordingly, the court denies summary judgment on this ground.

### III.

A careful review of Nolan's multiple intertwining complaints make certain things clear. Nolan does not believe that the warden and his second in command at the Botetourt Correctional Center know how to run a correctional institution properly. Nolan, correctly or incorrectly, believes that he does, and he views the State's system for processing employee grievances not simply as a vehicle to redress concrete, adverse employment decisions but also as a vehicle to impose his competing views on his superiors. It is also clear that he believes that the concededly important public work he performs as a correctional official automatically positions his employment-related grievances as protected speech. Contextually, the court finds that it does not and, therefore, that his transfer and the transfers of the other plaintiffs to other institutions did not infringe their rights to free speech.

Public employees do not surrender their First Amendment rights when they accept public employment. They maintain their right to speak on matters of "public concern." Pickering v.

5

Bd. of Edu., 391 U.S. 563, 574 (1968). Indeed, a consistent line of Supreme Court precedent has invalidated statutes and actions that have "sought to suppress the rights of public employees to participate in public affairs." Connick v. Myers, 461 US 138, 144 (1983). The Court has endeavored "to maintain for the government employee the same right enjoyed by his privately employed counterpart." Urofsky v. Gilmore, 216 F.3d 401, 407 (4th Cir. 2000). To that end, a critical determination "is whether the speech is 'made primarily in the employee's role as citizen or primarily in his role as employee.'" Urofsky, 216 F.3d at 407 (quoting Terrell v.Univ. of Texas Sys. Police, 792 F.2d 1360, 1362 (5th Cir. 1986)). That determination is made by examining the content, context, and form of the speech in light of the entire record. See Connick, 461 U.S. at 147-48. The court must focus on the capacity of the speaker in relation to the speech:

> This focus on the capacity of the speaker recognizes the basic truth that speech by public employees undertaken *in the course of their job duties* will frequently involve matters of vital concern to the public, without giving those employees a First Amendment right to dictate to the state how they will do their jobs.

Urfosky at 407 (emphasis added). Thus, a public employee does not speak on a matter of "public concern" simply because the subject matter is inherently important:

> Because almost anything that occurs within a public agency could be a concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee. In making this determination, the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment.

DiMeglio v. Haines, 45 F.3d 790, 805 (4th Cir. 1995) (quoting Terrell. v. Univ. of Texas Sys. Police, 792 F.2d at 1362).

6

With the above precepts in mind, the Court has little hesitancy in concluding that plaintiffs' grievances, that it assumes resulted in their transfers, neither implicated the public interest in receiving the well-informed views of government employees engaged in civic discussion nor the plaintiffs' rights as public employees to participate in public affairs. They were, at base, employee grievances – complaints that their superiors, by not acceding to their demands, were not performing their work well. Even in the light most favorable to Nolan, most of his grievances centered on seemingly personal disputes with some of his superiors and co-workers. The one complaint apparently common to all plaintiffs was the complaint that one or more hearing officers had unjustifiably dismissed or refused to process some institutional charges they had lodged against various inmates which plaintiffs believed undermined their authority and emboldened the inmates. However, it is contextually clear that plaintiffs complained or expressed their disagreement and dissatisfaction with defendants' handling of the matter not primarily in their role as citizens but rather primarily in their role as employees. More fundamentally, the dispute did not implicate the public's interest in receiving the well-informed views of government employees engaged in civic discussion, and plaintiffs' superiors did not transfer them to suppress their right to participate in public affairs. It follows that defendants did not infringe plaintiffs' rights to free speech.

The Supreme Court's most recent First Amendment pronouncement demonstrates the importance of focusing on the capacity of the speaker in relation to the speech. In <u>Garcetti v. Ceballos</u>, 126 S. Ct. 1951, 1960 (2006), the court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from

7

employer discipline." The plaintiff in Garcetti was a deputy district attorney for the Los Angeles County District Attorney's Office who, pursuant to his duties, investigated a complaint from a defense attorney regarding alleged inaccuracies in an affidavit used to obtain a search warrant. Id. at 1955. Following his investigation, Ceballos voiced his concerns to his supervisors and crafted memoranda in which he recommended that they dismiss the case. Id. at 1955-56. In spite of Cebellos' concerns, the district attorney proceeded with the prosecution. Ceballos was called by the defense during a motion hearing to attack the search warrant; however, the court upheld the warrant. Later, Ceballos claimed that his employer retaliated against him, by transferring him to a different courthouse and denying him a promotion. Id. at 1956.

In finding Ceballos' expressions unprotected, the Garcetti court stated that the controlling factor in the case was "that [Ceballos'] expressions were made pursuant to his duties as a calendar deputy." Garcetti at 1959-60. Distinguishing Garcetti from cases in which the First Amendment provides protection against discipline, the Court emphasized that Ceballos "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case" instead of as a citizen. Id. at 1960.

It is fairly debatable as to whether Garcetti controls the present case based on the argument that plaintiffs' complaints that their superiors were undermining their authority are tantamount to "statements pursuant to their official duties." Id. Some courts may read Garcetti that broadly. Under such a reading the first question is not whether the matter is one of public concern but simply whether the plaintiff was speaking as a part of his or her public job. If plaintiff was speaking as part of his or her public job, under their analysis, the inquiry is over. See Mills v. City of Evansville, 452 F.3d 646 (7th Cir. 2006) (the transfer of an uniformed police

8

sergeant who attended a meeting concerning patrol division reorganization and spoke openly in opposition did not violate her right to free speech *even if the topic was of public concern* because she spoke as an employee). In contrast, although this Court focuses on the capacity of the speaker in relation to the speech, it does so in order to answer two interrelated questions which ultimately determine whether the matter is one of public concern: did the dispute implicate the public interest in receiving the well-informed views of government employees engaged in civic discussion, and did the defendants' actions suppress the rights of public employees to participate in public affairs. If the answer to either or both of these questions is yes, then the court views the matter to be one of public concern. Here, the answer to both questions is no, so plaintiffs' speech is not protected because it is not a matter of public concern. Though the differences in theoretical approaches are not outcome determinative here, those differences may have practical consequences in other contexts. However, those theoretical differences are for another day; the court will grant defendants' motion for summary judgment.

## IV.

If an employee's speech is a matter of public concern, then the court determines whether the employee's interest in the expression outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace. See Pickering, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interest of the [employee], as citizen, in commenting upon matters of public concern and the interest of the State, as employer, in promoting the efficiency of the public services it performs through its employees."). With that principle in mind, even if the court viewed the content of plaintiffs' complaints to be matters of public concern, the court finds that defendants were justified in

9

transferring them.

The application of <u>Pickering's</u> balancing test decidedly favors the conclusion that defendants were justified in transferring the plaintiffs. It is inescapable that the working relationship between plaintiffs and defendants had deteriorated to an unacceptable level. Defendants could justifiably conclude that plaintiffs, their subordinates, were less than enthusiastic in carrying out their policies and commands. Indeed, a subordinate cannot challenge his superior's competence, as plaintiffs did here, in the guise of a grievance and expect his grievance to gain traction. In the words of the special agent who investigated the complaint concerning the dismissal of inmate disciplinary charges and noted that only 69 charges out of 624 charges were dismissed: " inmate disciplinary charges should be issued in a manner that best promotes the mission of the institution." (Terry Aff., Ex. F.,p.3). In that regard, unless removed, plaintiffs' superiors, not plaintiffs, have the responsibility of defining that mission and whether it is being met. "While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." <u>Connick</u>, 461 U.S. at 149. The tone of the criticism leveled here was substantially more combative than constructive. Under the circumstances, it made a viable working relationship unlikely. Again, in the words of the special investigatory agent: " [the] working relationship between all parties has been severely strained and . . . [has] eroded to a level that it is highly improbable that a normal employee-employer working relationship can be enjoyed." On balance, therefore, plaintiffs'

10

transfers did not contravene plaintiffs' rights to free speech.[4]

## IV.

For the reasons stated, the court grants defendants' motion for summary judgment.

**ENTER**: This September 13, 2006.

_____
UNITED STATES DISTRICT JUDGE

---

[4] Likewise, the court in Mills v. City of Evansville, 452 F.3d 646, 648 (7th Cir. 2006) observed that:
> Public employers must be able to change assignments in response to events (including statements) that reveal whether employees will be faithful agents of the decisions made by the politically accountable managers. It promotes rather than undermines first amendment values when those who make decisions, and are held accountable for them at the polls, can ensure their implementation within the bureaucracy. [Plaintiff's supervisor] was entitled to insist that his subordinates not play the 'Yes, Minister' game and undermine his directions. The power of transfer is essential if the top of the bureaucracy is to see its decisions through.

11